CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
GABRIELA RIVERA (Bar No. 283633)
(E-Mail: Gabriela_Rivera@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
DANIEL SANDOVAL

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DANIEL SANDOVAL,<br><br>Defendant. | Case No. 2:23-cr-00401-SVW<br><br>**DEFENDANT DANIEL SANDOVAL'S SENTENCING MEMORANDUM; EXHIBITS** |

Defendant Daniel Sandoval, through counsel, hereby submits this memorandum for the Court's consideration prior to sentencing.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: November 1, 2024     By  /s/ Gabriela Rivera
                                GABRIELA RIVERA
                                Deputy Federal Public Defender
                                Attorney for DANIEL SANDOVAL

## I. INTRODUCTION

Daniel Sandoval respectfully requests that the Court sentence him to a sentence to include 12 months' home confinement, 100 hours of community service, and a three-year term of probation.to address and punish his first-time criminal offense. Mr. Sandoval respectfully submits that a custodial sentence within the Guidelines range as calculated by Probation would be inappropriate for several reasons.

*First*, as a young man with no prior criminal history or even any prior contact with law enforcement, and particularly given his stable residence and employment, Mr. Sandoval represents an exceptionally low risk of recidivism. Following the offense conduct, he voluntarily interviewed with law enforcement, admitted his involvement, and accepted responsibility. Once charged, he entered into a plea agreement with the government and has expressed deep, meaningful remorse and anguish for his conduct.

*Second*, the Court should consider Mr. Sandoval's age at the time of the offense conduct. Indeed, the Sentencing Guidelines have recently been amended to allow for downward departures in recognition of the fact that cognitive changes lasting into the mid-20s affect individual behavior and culpability. Mr. Sandoval was 25 years old at the time the offense conduct which coincided with a crucial period in his development.

*Third* and moreover, a probationary sentence requiring home confinement with probation to follow is uniquely appropriate here. Mr. Sandoval is one of the main caretakers and providers for his ailing father, who spent weeks at the hospital this year and has been diagnosed with congestive heart failure. A term of home confinement will punish Mr. Sandoval while also allowing him to continue to provide necessary care for his father.

For all of these reasons, a non-custodial sentence is appropriate and just. As a result of his actions, Mr. Sandoval will now carry the label and stigma of a felon for the rest of his life. Time in prison is not necessary to impress upon him and society the seriousness of his first-time violation of this country's laws.

## II. THE PRESENTENCE REPORT

The Probation Office calculates a total offense level of 13 and criminal history category I, resulting in a recommended guideline range in 12-18 months. (ECF No. 26, PSR at 3.) Mr. Sandoval concurs in Probation's calculations, but respectfully requests a non-custodial sentence as described herein.

## III. THE APPROPRIATE SENTENCE

### A. A Probationary Sentence Appropriately Reflects the Circumstances of the Offense and Mr. Sandoval's History and Characteristics.

Mr. Sandoval is a soft-spoken young man of 28 years old who lives at home with his parents. Throughout his life, he has diligently and quietly pursued an education while maintaining steady employment. He not only had no prior criminal history prior to the offense conduct, but he had never had any contact with law enforcement. Recently, he has found himself serving as the main caretaker for his father, who was hospitalized for several weeks due to congestive heart failure and now requires near-constant care and assistance. He is a devoted son and a young man who made serious mistakes several years ago but otherwise represents an exceptionally low risk of recidivism.

#### 1. Mr. Sandoval Has No Prior Criminal History and Has Stable Housing and Employment

At the age of 28 years old, Mr. Sandoval continues to live with his mother and father at their home in Santa Fe Springs, California. He has lived with his parents and his brother for all of his life, including while he pursued and obtained a college degree. Gentle and soft-spoken, Mr. Sandoval has at times lacked direction, and upon completing college he was unsure of what career to pursue. Recently, and as a result of serving as a caretaker for his father, Mr. Sandoval has developed an interest in caretaking and nursing. (Exhibit A, Letter from Daniel Sandoval.)

At the time of the offense conduct, Mr. Sandoval and much of the world were still living relatively isolated lives in their homes and online as a result of the COVID-

3

19 pandemic. Disconnected from reality during that time, Mr. Sandoval made an impulsive and foolish decision to engage in the offense conduct: from March 21 to 23, 2021, Mr. Sandoval reported eight purported online "tips" to the United States Department of Defense reporting system that conveyed false information about potential threats. (ECF No. 37, PSR at ¶ 15.) Law enforcement officers immediately identified Mr. Sandoval as the source of the tips, and FBI agents interviewed him at his home on March 24, 2021. (PSR at ¶ 35-36.) Mr. Sandoval admitted that the "tips" were false, that there was never a threat to any Army or Navy facility, and that he thought he was playing an ill-advised "prank" on girls he used to know or knew of. (PSR at ¶ 35-36.)

Since then, Mr. Sandoval has continued to live at home, work, and contribute to his household. He has never had any other contact with law enforcement outside of this case. He was arrested (rather than given the opportunity to appear pursuant to a summons) and made his initial appearance in this case in September 2023. (ECF No. 9.) He was released on conditions and, with one minor exception, has performed admirably while on pretrial release. Indeed, as reflected in the revised PSR (¶¶ 70-71) and described in more detail below, Mr. Sandoval has spent much of this last year providing critically necessary care to his father.

2. **Mr. Sandoval's Age at the Time of the Offense Conduct Merits a Downward Departure or Variance**

As the Sentencing Guidelines now recognize, a downward departure or variance may be appropriate where the offense conduct occurred when the defendant was in his mid-20s or younger.[1] Specifically, the Guidelines recognize that youthful individuals--

---

[1] The Sentencing Guidelines were recently amended, and these amendments are effective November 1, 2024. The text of these Amendments, and supplemental information from the Sentencing Commission, is available in the Reader-Friendly Guide, here: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202405_RF.pdf

4

1  which the Gudelines now clearly and expressly define as someone in their mid-20s or
2  younger--are generally are more impulsive, risk-seeking, and susceptible to outside
3  influence as their brains continue to develop into young adulthood. Furthermore, the
4  Guidelines confirm, youthful individuals also are more amenable to rehabilitation. (*See*
5  Amended §5H1.1.)

6        Amended §5H1.1 reflects decades of developmental research that suggests that
7  the process of psychological maturity continues well into a person's twenties, with the
8  pace of maturation in men slower than that of women.  *See* Emily Buss, *What the Law*
9  *Should (And Should Not) Learn From Child Development Research*, 38 Hofstra L. Rev.
10 13, 39-40 (2009).  Likewise, studies in neurobiology and psychology show that
11 "cognitive skills and emotional intelligence continue to develop into a person's mid-
12 20s, and even beyond."  Selen Siringil Perke & Lael Chester, *Emerging Adults: A*
13 *distinct population that calls for an age-appropriate approach by the justice system*,
14 Emerging Adult Science in Massachusetts 1 (June 2017).  As a result, young people are
15 "overly motivated by reward seeking behavior, more susceptible to peer pressure, and
16 more prone to risk-taking and impulsive behavior." *Id*.

17       Indeed, the United States Supreme Court has repeatedly recognized that youthful
18 offenders are both less culpable and more amenable to rehabilitation than adults, and
19 that these differences must be considered at sentencing. In *Roper v. Simmons,* 543 U.S.
20 551 (2005), the Court held that the Constitution forbids executing minors. *Id.* at 569-
21 570. There, the Court acknowledged that brain science confirms youthful offenders: (1)
22 lack maturity and have an underdeveloped sense of responsibility; (2) have a
23 heightened susceptibility to negative influences and outside pressures; and (3) have a
24 moral character that is "more transitory" and "less fixed" than that of an adult. *Id*.
25 Similarly, in *Graham v. Florida,* 560 U.S. 48 (2010), the Court found life without
26 parole sentences unconstitutional for minors who commit non-homicide crimes. *Id*. at
27 68. There, the Court reiterated that "parts of the brain involved in behavior control
28 continue to mature through late adolescence." *Id*. Finally, in *Miller v. Alabama*, 567

U.S. 460 (2012), the Court held unconstitutional mandatory life without parole for juvenile offenders. *Id*. at 470. There, the Court again acknowledged that "adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance." *Id*. at n.5.

Here, the offense conduct coincided with a crucial period in Mr. Sandoval's development. He was 25 years old and at a period of his life where his development was particularly susceptible to "influence and psychological damage." *See Roper*, 543, U.S. at 569 (citation omitted); *see also* Brief for the American Psychological Association as Amicus Curiae, p. 20, *Miller v. Alabama*, 567 U.S. 460 (2012) (noting that the process of brain development and identity formation "remains incomplete until *at least* the early twenties" (emphasis added)). Here, the proposed sentence acknowledges the mitigating factors of youth outlined by the Supreme Court in *Roper*. It recognizes that Mr. Sandoval "lack[s] [] maturity" and has heightened "susceptib[ility] to negative influences and outside pressures." *Roper*, 543 U.S. at 569. It also honors that Mr. Sandoval's "character . . . [was] not as well formed as that of an adult" and that his personality traits were, at that time, "more transitory" and "less fixed." *Id*. Given this reality, the proposed sentence is sufficient to impress upon Mr. Sandoval the importance of following the law, but also prevents him from spending an excessive amount of his most formative years inside a federal prison.

### 3. A Variance is Appropriate to Account for the Delayed Indictment

Law enforcement officers identified Mr. Sandoval almost immediately following the offense conduct. FBI agents went to Mr. Sandoval's home where he voluntarily submitted to an interview and admitted his involvement. Despite knowing Mr. Sandoval's identity, address, and acceptance of responsibility, the government took almost two and a half years to indict Mr. Sandoval.

The Court should consider this issue under 18 U.S.C. § 3553(a) which requires, in part, that the sentence imposed promote respect for the law and provide just punishment for the offense. Lengthy, but unjustified delays call into question the

1    purpose and even the validity of the punishment. Essentially, the longer the delay, the
2    weaker the justification for imposing a punishment in terms of the punishment's basic
3    or retributive or deterrent purposes. *Knight v. Florida*, 528 U.S. 990 (1999) (Breyer, J.,
4    dissenting). Or as Justice Stevens put it, "The deterrent value of any punishment is, of
5    course, related to the promptness with which it is inflicted." *Coleman v. Balkcom*, 451
6    U.S. 949, 952 (1981) (Stevens, J., concurring in the denial of cert.); *see also United*
7    *State. v. Cornielle*, 171 F.3d 748, 754 (2d Cir. 1999) (among other things, four-year
8    pre-indictment delay warranted a downward departure).

9          It is not clear why the government waited years to indict Mr. Sandoval. The
10   delay undermines the purpose and validity of any punishment imposed on Mr.
11   Sandoval, particularly where Mr. Sandoval has spent the last several years living
12   peaceably with his family exactly where law enforcement expected him to be. The
13   defense respectfully submits that the years-long delay warrants a downward variance in
14   offense level and further supports Mr. Sandoval's request for a non-custodial sentence.

**B.   The Proposed Disposition Will Allow Mr. Sandoval to Continue Providing Necessary Caretaking For His Father**

17         A custodial sentence will moreover deprive Mr. Sandoval's father from essential
18   caretaking service he requires as a result of his congestive heart failure. Earlier this year,
19   Mr. Sandoval was with his father, Martin Sandoval, at their home when Martin began
20   vomiting, coughing up blood, and struggling to breathe. (PSR ¶¶ 70-71) Mr. Sandoval
21   called 911, and his father was taken by ambulance to a hospital, where he remained for
22   three weeks. The family was advised that Martin had been diagnosed with congestive
23   heart failure, and that his heart was functioning at 20-25% capacity. (*Id.*) Since then, he
24   has been admitted to urgent care and an emergency room on more than one occasion.

25         In a reversal of roles, Mr. Sandoval now finds himself providing the same attentive
26   care for his father than his father provided to him when he was a child. Martin now must
27   attend frequent medical appointments, "heart clinic" appointments, and therapy
28   appointments. He requires various medications to be administered at all hours of the day.

His pulse and his blood pressure also must be monitored throughout the day. He can no longer work, drive, or even get around the house on his own or without supervision. Mr. Sandoval has willingly taken on the extra responsibility of caring for his father and has done some with commendable fervor. (PSR ¶¶ 70-71; Ex. A.)

The Sandoval family has been financially impacted by Martin's decline in health. Martin has not been able to return to work. Raquel, who had retired from her decades-long service as a civilian employed by the LAPD, returned to work in order to try to make a dent in the mounting medical bills. (PSR ¶¶ 70-71) Raquel and Mr. Sandoval have coordinated their work schedules to ensure that one of them is always with Martin-- Raquel frequently works in the evening and late shift as a certified nurse's assistant at a hospital, and Mr. Sandoval works during the morning and day as a driver for various app-based companies. (PSR ¶¶ 70-71)

The proposed sentence will both serve to sanction Mr. Sandoval while ensuring he may continue to provide these essential services for his father.

**C.    The Proposed Sentence Will Sufficiently Punish Mr. Sandoval**

The appropriate sentence under § 3553 is a term of 12 months of home confinement, 100 hours of community service, and a three-year term of probation.

On its own, a felony conviction will impose a significant sanction on Mr. Sandoval, who has no such prior convictions. And at a more basic level, Mr. Sandoval is remorseful for his actions. As he describes in his letter to the Court, Mr. Sandoval has felt great shame and embarrassment over his conduct and how it has affected so many other people. (Ex. A.) He is particularly distressed when he reflects on the anguish and fear that his conduct has caused his parents. Mr. Sandoval's mother has also borne witness to years of Mr. Sandoval expressing remorse and shame. (Ex. B.)

Given his earnest feelings of remorse, it is therefore no surprise that Mr. Sandoval immediately accepted responsibility and pleaded guilty in this case. He has never disclaimed responsibility, and indeed immediately admitted his conduct to law enforcement.

Home confinement moreover strikes the appropriate balance under § 3553 in light of his caretaking obligations and his advancing age. Both the Sentencing Guidelines and the Bureau of Prisons moreover contemplate the usage of home confinement in place of imprisonment. *See* 28 C.F.R. § 570.20(b) *et seq.* (vesting the Bureau of Prisons with authority to designate inmates to home confinement); U.S.S.G. § 5F1.2 ("Home detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment."); *see also United States v. Lopez-Pastrana*, 889 F.3d 13, 18-19 (1st Cir. 2018) ("Home confinement is treated as a form of 'custody' under federal law . . . ."). While each is subject to certain limitations, they reflect a shared belief that home confinement is a meaningful punishment. And the constant need to receive permission from his location officer in order to travel anywhere outside of his home will serve as an additional reminder that Mr. Sandoval is being sanctioned for his conduct.

## IV. CONCLUSION

For the foregoing reasons, Mr. Sandoval respectfully requests that the Court sentence him to a term of 12 months of home confinement, 100 hours of community service, and three years of probation.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: November 1, 2024      By  */s/ Gabriela Rivera*
GABRIELA RIVERA
Deputy Federal Public Defender
Attorney for DANIEL SANDOVAL

9